CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
2/24/2026
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
      DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

HERMAN TRACY EVANS,

                     *Plaintiff,*

        v.

THE CITY OF LYNCHBURG, ET AL.,

                    *Defendants.*

CASE NO. 6:24-CV-00019

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

      Herman Evans ("Evans") claims Lynchburg Police Officer Seth Reed ("Reed") violated his constitutional rights by kicking down his front door, punching him in the head multiple times, and allowing the canine Knox ("Knox") to attack him. Dkt. 30. He also asserts the City of Lynchburg ("City") violated his constitutional rights by having a custom of tolerating the use of excessive force by its police officers and by failing to train its officers about appropriate levels of force. *Id.* He seeks monetary damages pursuant to 42 U.S.C. § 1983. *Id.*

      The City and Reed dispute these claims and have moved for summary judgment. Dkts. 46,48. The City argues it is entitled to summary judgment because Evans has not produced anything in the summary judgment record showing the City: (1) ignored widespread past instances where excessive force was used by its police officers, or (2) failed to train its police force about appropriate levels of force. Likewise, Reed argues: (1) no reasonable jury could find that his actions were unreasonable given the "threat" Evans posed; and (2) he is otherwise entitled to qualified immunity. Evans opposes both motions and argues there is sufficient evidence to allow his § 1983 claims to proceed to a jury. Dkts. 54,59.

For the following reasons, the City's motion for summary judgment will be granted; however, Reed's motion for summary judgment will be denied.

I.  BACKGROUND

**A. Incident on April 3, 2022**

At approximately 3:30 p.m. on April 3, 2022, the Lynchburg Police Department ("LPD") received an emergency call that there was a man swinging a sledgehammer around his front yard. *See* Reed Depo. 21:16-19; 24:22-25:4. According to the caller, the man was yelling and cursing at his neighbors. *Id.* Reed responded to the call. *Id.*

When Reed first arrived at the residence, no one was outside. *See* Reed Body Camera 1:24. As Reed approached the residence, Evans yelled "God dammit" from inside the residence. *Id.* 1:39. From the yard, Reed announced himself saying "Police Department.," *id.* 1:41, and then Evans opened the front door. Reed asked Evans if he was "okay," *id.* 1:57, and Evans responded, "yeah, I'm fine. How are you doing?" *Id.* 1:58. Reed asked, "what's going on," *id.* 2:01, and Evans respond, "not a fucking thing is going on." *Id.* at 2:02. Evans then went back inside and closed the storm door behind him. *Id.* 2:03. Reed said "okay, you have a good day, alright," *id.* 2:05, and tells Evans, "just don't come outside, I don't want you to get arrested."[1] *Id.* 2:08–2:10.

After Reed issued his instruction, Evans opened the door, stood on his front porch, and said, "what did you say? *Id.* 2:12. Reed responded, "I said don't come outside, I don't want you

---

[1] It is unclear what legal authority Reed was relying upon when ordering Evans to stay inside his home as, citizens are free to move as they please unless and until they commit a crime, and Evans had not committed a crime when Reed gave that instruction. *See Mohamed v. Holder*, 266 F. Supp. 3d 868, 878 (E.D. Va. 2017) ("[F]reedom of movement is a core constitutional value."); *see also Williams v. Fears*, 179 U.S. 270, 274 (1900) ("[T]he right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any state is a right secured by the 14th Amendment and by other provisions of the Constitution.").

to get arrested because we got calls about you being outside." *Id.* 2:15–2:19. Evans said, "I'm not outside motherfucker, leave." *Id.* 2:20. Reed said, "alright, have a good day." *Id.* 2:21. Evans yelled again, "You get your fucking piece of shit ass out of here, alright." *Id.* 2:26–2:27. Reed responded, "Sir, you need to go inside." *Id.* 2:28. Evans retorted, "You should leave, get your fuck back in the car, LPD." *Id.* 2:33. Reed responded, "just stay inside, alright," *id.* 2:35.

After this exchange of unpleasantries, Reed started walking back to his police cruiser. *Id.* 2:36. Even though Reed was leaving, Evans opened his door again and unleashed more expletives against Reed. *Id.* 2:43. Reed paused for a moment and turned towards Evans but then continued walking towards his cruiser.

As Reed approached his vehicle, Officer Williams ("Williams") arrived. *Id.* 3:05. Evans came onto his front stoop again and shouted, "I told you to leave motherfucker." *Id.* 3:11. Reed yelled at Evans "if you come outside one more time, you're going to jail for disorderly conduct." *Id.* 3:12–3:15. Evans shouted, "fuck you." *Id.* 3:16. Reed then grabbed Knox's leash from the front of his vehicle, *id.* 3:21, and said "I'm going to get the dog." *Id.* 3:22. Reed opened the back of his vehicle; leashed Knox; and Reed, Williams, and Knox walked towards Evans' residence. *Id.* 3:26 – 3:34.

Even though Evans was inside his residence with the door shut, Reed told Williams, "we'll take him to jail for disorderly conduct." *Id.* 3:35. Reed then told Williams, "he's already been outside, so we've got him."[2] *Id.* 3:46. As Reed and Williams approached the front porch, Evans hit his window and yelled "fuck both of y'all, fuck you! Fuck you! Fuck you!" *Id.* 3:56. Evans then opened his front door but kept the storm door shut. *Id.* 4:08. Reed said, "you're under arrest

---

[2] At the point in the video when Reed says, "he's already been outside," Evans has never strayed further than the threshold of his home.

3

for disorderly conduct." *Id.* 4:09–4:11. Evans responded, "what?" *Id.* 4:12. Reed repeated, "you're under arrest for disorderly conduct," and went to open the storm door. *Id.* 4:13. While Reed was opening the storm door, Evans slammed the front door shut. *Id.* 4:14.

In response, Reed kicked the front door open, and Knox immediately lunged forward through the partially open door and latched onto Evans' arm.[3] *Id.* 4:15. As Knox bit Evans in his arm, Evans said, "Oh goddam," and Reed ordered Evans to the ground. *Id.* 4:19–4:20. Reed then shouted at Evans "not to hurt the dog,"[4] and punched Evans in the head. *Id.* 4:21–4:37. Evans fell to the floor, and Reed struck him in the head three more times while Knox continued to bite Evans' arm and shoulder. *Id.* Even though Evans was passed out, Knox continued to jerk Evans' arm and shoulder back and forth. *Id.* 4:41–4:45. After approximately 30 seconds, Reed gave Knox the command to stop attacking; however, Reed had to use the leash to pull Knox off Evans. *Id.* 4:45–4:48.

Evans was then handcuffed; arrested for disorderly conduct; transported by ambulance to Lynchburg General Hospital; and admitted for treatment. He was ultimately charged with resisting arrest, disorderly conduct, and animal cruelty and was convicted in the Lynchburg Circuit Court. However, a unanimous panel of the Virginia Court of Appeal reversed his convictions, holding that the trial court should have stricken the charges for lack of evidence. *See Evans v. Commonwealth*, 2024 WL 3657053, at *1 (Va. Ct. App. Aug. 6, 2024).

---

[3] No audible attack command from Reed to Knox can be heard until after Knox bit Evans. *Reed Body Camera* at 4:16–4:17. According to the LPD, the attack command is "Packen." Dkt. 49 at 6. However, in the video, you do not hear Reed say "Packen" until after Knox has bitten Evans.

[4] On the record presented to the Court, and from Reed's shoulder-camera, it appears Evans is trying to pry Knox's jaws from his arm.

### B. LPD Training and Policies

The City requires LPD officers to complete in-service training every six months. Reed Depo. 66:22-67:11. This training includes how to gauge the proper use of force in various scenarios. *Id.* 67:16-68:10. In addition to this standard training, the canine unit completes canine specific training once per month. *Id.* 68:11-24. This canine training includes review with the master trainer of the LPD policy on apprehension using a canine, as well as various forms of apprehension training. *Id.* 68:25-71:8.

## II. LEGAL STANDARDS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The nonmoving party may avoid summary judgment by demonstrating a dispute of material fact that would allow a reasonable jury could return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

### III. DISCUSSION

The Fourth Amendment prohibits unreasonable seizures, including "seizures effectuated by excessive force." *See Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006). The legal vehicle for remedying a constitutional violation is 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Evans seeks § 1983 relief, arguing the City and Reed violated his constitutional rights on April 3, 2022. Dkt. 30.

#### A. City's Motion for Summary Judgment

The City seeks summary judgment on both § 1983 claims against it, arguing that no reasonable juror could find that it: (1) condoned the use of excessive force by its police officers, Dkt. 47 at 4–5, or (2) failed to train its officers about appropriate levels of force, *id.* at 5–7. The Court will address each of these arguments.

##### 1. *Monell* Liability

A municipality is a "person" within the meaning of § 1983 and may be held liable for its own constitutional violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014). "*Monell* claims" are only viable, though, "when execution of a government's policy or custom . . . inflicts [an] injury[.]" *Monell*, 436 U.S. at 694. A plaintiff can establish a municipal policy or custom in four ways:

1) Through an express policy, such as a written ordinance or regulation;

2) Through the decisions of a person with final policymaking authority;

3) Through an omission, such as a failure to properly train officers, that 'manifest [s] deliberate indifference to the rights of citizens'; or

4) Through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'"

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). Here, Evans relies on the third and fourth ways.[5]

### a. Persistent and Widespread Custom

Evans first relies on a *Monell* theory called "custom by condonation." *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir.1987); *see also Owens*, 767 F.3d at 402. Under this theory, a municipality violates § 1983 if it fails "to put a stop to or correct a widespread pattern of unconstitutional conduct." *Id.* at 1389. Prevailing under such a theory is no easy task. *Id.* A plaintiff must point to a "persistent and widespread practice[ ] of municipal officials," the "duration and frequency" of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their "deliberate indifference." *Id.* at 1386–91 (alterations omitted). Both knowledge and indifference can be inferred from the "extent" of employees' misconduct. *Id.* at 1391.

In his Amended Complaint, Evans alleged fifteen past incidents where LPD officers used excessive force against citizens. *See* Dkt. 30 ¶ 51. However, in its summary judgment motion, the City asserts that Evans conducted no discovery to substantiate those allegations and argues no admissible evidence exists in the summary judgment record about those fifteen incidents. Dkt. 47

---

[5] The municipal policy must be the "moving force" behind the constitutional violation: *i.e.*, the plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 182 (4th Cir. 2023) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)). Vicarious liability or *respondeat superior* cannot provide a basis for liability; rather, a *Monell* claim must be based on the municipality's actions. *Id.*

at 5. In response, Evans cites the City's denials that there were past excessive force incidents with LPD officers. *See* Dkt. 59 at 4–5. These citations to the City's Answer are insufficient to create a triable issue as to whether there were past instances of LPD officers using excessive force, and if so, whether the City knew or should have known about those instances. *See Anderson*, 477 U.S. 242, 247. Therefore, the City is entitled to summary judgment on that claim.

### b. Failure to Train Claim

Evans also argues the City was deliberately indifferent to his Fourth Amendment rights by failing to train its police officers about acceptable levels of force. Dkt. 59 at 5–7. The Supreme Court has acknowledged that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."[6] *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To sustain a "failure to train" claim against a municipality, a plaintiff must usually offer proof of "a pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62; *see also Canton*, 489 U.S. at 390, n.10.

Where a municipality knows or should have known of its employees' unconstitutional or tortious actions and fails to adjust its training, a plaintiff may establish "conscious disregard" necessary to prove a § 1983 violation. *Id.* However, without some sort of notice that its "training is deficient in a particular respect" municipal decisionmakers "can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* In this case, Evans cites no admissible evidence of past incidents where LPD officers used excessive

---

[6] The municipality's failure to train must amount to "'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). To be deliberately indifferent, municipal policymakers must have "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights[.]" *Id.*

force. Therefore, he cannot establish the pattern necessary to show that the City knew or should have known its use of force training was deficient and did nothing about it. *See Connick*, 563 U.S. at 61.

In a narrow subset of cases, the Supreme Court allows failure to train claims to proceed against a municipality when there is a single instance of misconduct. However, the facts surrounding this claim do no present one of those instances. The Supreme Court has rejected the proposition that municipal indifference can be inferred from a single officer's inadequacies. *See Canton*, 489 U.S. at 390–91. Here, Evans seeks an inference that the City's training is deficient based on Reed's conduct. Dkt. 59 at 6–7. Because Evans' failure to train claim depends on Reed's alleged misconduct to establish an inference of the City's indifference, and because this type of inference is not permitted, the City is entitled to summary judgment on that claim.

### B. Officer Reed's Motion for Summary Judgment

#### 1. Excessive Force Claim

Reed also seeks summary judgment on Evans' § 1983 claims, arguing that no reasonable juror could find that he used excessive force against Evans. Dkt. 49 at 10–14. Excessive force cases are decided using the Fourth Amendment's reasonableness standard, guided by three factors: (1) the "severity of the crime" that is the subject of the stop or arrest, (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *See Graham v. Connor*, 490 U.S. 386, 395-96 (1989); *see also Benton v. Layton*, 139 F.4th 281, 288 (4th Cir. 2025).

Analyzing the three *Graham* factors "requires careful attention to the facts and circumstances of each particular case." *Id.* Whether reasonable or excessive force was used is "based on the totality of the circumstances." *Aleman v. City of Charlotte*, 80 F.4th 264, 285 (4th

9

Cir. 2023). "[A] court cannot ... 'narrow' the totality-of-the-circumstances inquiry, to focus on only a single moment. It must look too ... at any relevant events coming before." *Barnes v. Felix*, 605 U.S. 73, 83 (2025). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. With these general standards in mind, the Court will assess each of the *Graham* factors.

### a. Severity of the Crime

The first *Graham* factor requires the Court to consider the severity of the crime. 490 U.S. at 396. To begin, no one suggests that Reed responded to Evans' home because Evans had committed a crime; rather, he came to Evans' residence for a safety and wellness check. Then, at most, Reed thought Evans committed disorderly conduct based on his disrespectful comments to Reed. *See* Reed Body Camera 3:35 ("We'll take him to jail for disorderly conduct.").

In Virginia, a person commits disorderly conduct if:

> With the intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, he [i]n any street, highway, or public building, or while in or on a public conveyance, or while in a public place engages in conduct having a direct tendency to cause acts of violence by the person or persons at whom, individually, such conduct is directed.

Virginia Code § 18.2-415. The Court of Appeals of Virginia already found that no evidence supported Evans' conviction for disorderly conduct because nothing he said or did would tend to cause another person to respond with violence, *Evans*, 2024 WL 3657053, at *6–9, especially a

10

well-trained police officer.[7] *City of Houston v. Hill*, 482 U.S. 451, 462 (1987) ("[A] properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen and thus be less likely to respond belligerently to fighting words."). While sufficiency of the evidence and probable cause are not synonymous, a reasonable jury could go one step further and find that Reed lacked probable cause to believe Evans had committed disorderly conduct. Where, as here, the factfinder could determine that no crime at all was committed, the first *Graham* factor weighs in the plaintiff's favor.[8] *See Bailey v. Kennedy*, 349 F.3d 731, 743-44 (4th Cir. 2003) (When the subject of a seizure "ha[s] not committed any crime, this factor weighs heavily in [the subject's] favor."); *see also Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005) ("[T]he severity of the crime cannot be taken into account because there was no crime.").

Even assuming Reed had probable cause to arrest Evans for disorderly conduct, disorderly conduct is a non-violent, misdemeanor. Generally, misdemeanors require officers to moderate the level of force used to effectuate an arrest.[9] *E.g.*,; *M.Y.M. v. Chavis*, 582 F. Supp. 3d 323, 334 (E.D.

---

[7] There is no potential for a *Rooker-Feldman* problem in this case because the Court of Appeals of Virginia overturned Evans' convictions. *See Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202 (4th Cir. 1997) (*Rooker-Feldman* is implicated if "in order to grant the federal plaintiff the relief sought, the federal court must determine that the [state] court judgment was erroneously entered or must take action that would render the judgment ineffectual.").

[8] Although the Virginia Court of Appeals has already found that Evans did not commit disorderly conduct as defined by Virginia Code § 18.2-415, that does not fully resolve the question of whether probable cause existed. *See Evans*, 2024 WL 3657053, at *6–9. There is a difference between evidence sufficient for probable cause and evidence sufficient for a conviction. *See Hupp*, 931 F.3d at 318 ("Evidence sufficient to secure a conviction is not required, but probable cause exists only if there is sufficient evidence on which a reasonable officer at the time could have believed that probable cause existed for the arrest.").

[9] Virginia Code § 18.2-415 does not contemplate violence from the perpetrator but instead anticipates that the perpetrator's conduct may cause another to act violently. If the perpetrator themselves acted violently towards another, they would be charged with a different and likely more serious crime.

11

Va. 2022) (noting that nothing about the commission of misdemeanors indicates a threat to officer safety); *see also Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015); *Nazario v. Gutierrez*, 103 F.4th 213, 234 (4th Cir. 2024). The fact that Reed thought Evans had committed a misdemeanor weighs in favor of Evans. Reed concedes as much. Dkt. 49 at 11 ("[T]he first *Graham* factor likely weighs in Evans' favor.").

### b. Threat to the Officers or Others

The second *Graham* factor requires the Court to consider the threat posed to officers or others. 490 U.S. at 396. "In assessing the threat an individual poses, it is often useful to consider the suspect's conduct at the time of the arrest and 'the size and stature of the parties involved.'" *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 180–81 (4th Cir. 2018). Courts also often consider whether the suspect has any weapons or has made any threats. *Id.*; *see also Lewis v. Caraballo*, 98 F.4th 521, 532 (4th Cir. 2024). Evans was undoubtedly foul-mouthed and unpleasant when interacting with Reed. But nothing in the well-documented video of the incident would lead any well-trained officer to believe Evans posed any danger to Reed or Williams.

First, the fact that Evans was only suspected of committing a misdemeanor generally indicates a low threat to officer safety. *See Ray*, 781 F.3d at 102 ("[T]his nonviolent misdemeanor offense was not of the type that would give an officer any reason to believe that Smith was a potentially dangerous individual."); *see also Chavis*, 582 F. Supp. 3d at 334. Second, based on the bodycam video, it appears that Evans' size and stature presented little threat to Reed and Williams.[10] Third, Evans did not possess a weapon and there is no allegation that either officer

---

[10] Evans appears to be in his fifties or sixties. *See Reed Body Camera* 7:05. He is also a man of average build and (at best) average physical fitness. *Id.* Reed and Williams appear younger, taller, and fitter than Evans. *Id.*

12

believed he did at the time of the arrest.[11] And finally, although Evans used vile language, he never threatened Reed or Williams. To the contrary, the goal of Evans' expletive-filled tirade was to get Reed and Williams to leave. *See supra* (I)(A).

Under these factual circumstances, the second *Graham* factor weighs in Evans' favor and against granting summary judgment to Reed. Ultimately, the jury must decide whether Evans did anything to threaten Reed or Williams that would warrant the level of force Reed used.

### c. Resisting or Evading Arrest

The third *Graham* factor requires the Court to consider whether Evans was actively resisting arrest or attempting to flee. 490 U.S. at 396. Unquestionably, Evans slammed his front door in Reed's face when Reed told him he was under arrest. To the average person, that could be considered "evading." However, the third *Graham* factor contemplates more from a suspect.

To "resist" arrest, a suspect must do more than "naturally respond to the physical nature of the arrest." *Lewis*, 98 F.4th at 531. A suspect can "defend[] [themselves] against a sudden all-out physical assault from an officer." *Id.* However, a suspect cannot escalate the physical altercation with the officer by kicking, hitting, or repeatedly pulling away from the officer. *Hicks v. City of Lynchburg*, 696 F. Supp. 3d 211, 226 (W.D. Va. 2023). Here, Reed argues that Evans resisted by hitting Knox; but Reed's bodycam video does not unequivocally show Evans hitting Knox.[12] Moreover, a reasonable juror could find that it shows Evans "naturally responding" to Knox's bite

---

[11] Reed suggests the threat was heightened because: (1) the 911 caller had indicated Evans had been swinging a sledgehammer in his yard; and (2) Reed thought Evans may be under the influence of drugs. Dkt. 49 at 12. At the time of Reed's encounter with Evans, though, there was no sledgehammer in sight. Moreover, a reasonable juror who viewed the bodycam footage could conclude Evans was not intoxicated. To be sure, he appeared angry that the police showed up to his house; however, this anger does not mean Evans was necessarily high on methamphetamines, as Reed suggests.

[12] This is just one example of a disputed material fact.

13

by trying to pry his jaws open. In fact, Evans quickly fell to the floor after being struck in the head by Reed and remained compliant the rest of the time.

Likewise, to flee or evade arrest, a suspect must take active steps to escape the officer's custody. *E.g.*, *Ray*, 781 F.3d at 102. Here, Evans never moved more than a few feet from his front door. Reed has presented no credible evidence that Evans attempted to escape Reed's control beyond slamming his front door closed. Therefore, the third *Graham* factor is also favorable to Evans, albeit less than the first two factors.

#### d. Totality of the Circumstances

Even though a reasonable jury could find that all three *Graham* factors support a finding of excessive force, those factors are not "exclusive." Factfinders may identify other "objective circumstances potentially relevant to a determination of excessive force," *Dolgos*, 884 F.3d at 179, but must always keep an "eye toward the proportionality of the force in light of all the circumstances." *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016).

Having reviewed the entire bodycam video, the Court concludes that reasonable jurors could find that Reed used disproportionate and excessive force against Evans given all the circumstances. However, the conclusion that a reasonable jury could return a verdict in Evan's favor on his excessive force claim does not fully resolve Reed's summary judgment motion. The Court must still consider whether Reed is entitled to qualified immunity.

### 2. Qualified Immunity

Qualified immunity protects government officials from civil lawsuits "insofar as their conduct does not violate clearly established ... rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011); *Pinder v. Johnson*, 54 F.3d 1169, 1177–78 (4th Cir. 1995). The doctrine squares

two important interests: "the need to hold public officials accountable when they exercise [their] power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The defense shield officials when "(1) there is no constitutional violation, or (2) the constitutional right "was [not] 'clearly established' at the time of" its alleged violation;" however, it provides no shield when officers have acted "incompetent[ly]" or have "knowingly violate[d] the law." *Malley v. Briggs*, 475 U.S. 335, 341, (1986); *see also Pearson*, 555 U.S. at 232; *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 395–96 (4th Cir. 2014); *Occupy Columbia v. Haley*, 738 F.3d 107, 125 (4th Cir.2013).

Here, the Court has already found there is sufficient, admissible evidence to "make out a violation of a constitutional right"—namely, the rights to be free from unlawful seizure and from excessive force. *Supra* (III)(B). The only question then is whether Reed's actions were unreasonable considering clearly established law at the time of the incident.

For a right to be clearly established, its contours "must be sufficiently clear [such] that a reasonable official would [have] underst[ood] that what he [was] doing violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held [to be] unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Rather, liability follows if the state of the law is such that it would have been "apparent" to an officer that his conduct violated a statute or constitutional law. *Anderson*, 483 U.S. at 640.

Reed argues his conduct on April 3, 2022, did not violate a right that was clearly established by the Supreme Court, the Fourth Circuit, or the Virginia Supreme Court. Dkt. 49 at 14–16. Specifically, he asserts that: (1) it was not clearly established that an officer must give a verbal

15

warning before deploying a *leashed* canine, *id.* at 14–15; and (2) his use of force was "reasonable given Evans' threatening and combative behavior prior to, and active and physical resistance during, his arrest." Dkt. 49 at 16. Each of these arguments will be considered in turn.

### a. It is not clearly established that an officer must give a verbal warning before deploying a leashed canine.

In his summary judgment motion, Reed admits that: (1) he did not give a verbal warning to Evans before deploying Knox; and (2) the "failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context." Dkt. 49 at 15 (quoting *Vathekan v. Prince George's County*, 154 F.3d 173, 179 (4th Cir. 1998)). He argues, however, that he is entitled to qualified immunity because he never "released" Knox, but instead kept him on a leash. *Id.* According to Reed, it is not clearly established that officers must give a verbal warning before ordering a *leashed* dog to attack. *Id.* The Court agrees.

In the 1990s, the Fourth Circuit issued two decisions that appeared to clearly establish that officers violated the Fourth Amendment if they ordered their canines to attack a suspect without first giving a verbal warning. *See Vathekan*, 154 F.3d at 173; *Kopf v. Wing*, 942 F.2d 265 (4th Cir. 1991). However, the Fourth Circuit later "muddied the waters" when noting a difference between "releasing" an unleashed police dog and allowing a leashed canine to attack. *See Maney v. Garrison*, 681 F. App'x 210, 216 (4th Cir. 2017) ("there is no denying that *Melgar* muddied the question of whether officers must issue warnings when utilizing police dogs on leash") (citing *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 358 (4th Cir. 2010)). According to the *Melgar* majority, releasing an unleashed canine without a warning clearly violates established law while allowing a leashed canine to attack a suspect without warning does not. 593 F.3d at 358. Regardless

16

of the "propriety of the distinction" between unleashed and leashed canine deployments,[13] neither the Supreme Court, the Fourth Circuit, nor the Virginia Supreme Court have clearly held that an officer violates the Fourth Amendment if they deploy a *leashed* canine without warning. *Maney*, 681 F. App'x at 216.

Setting aside *Melgar*'s lack of clarity, Reed's argument that he is entitled to qualified immunity fails because a reasonable jury could find that he violated other clearly established rights.

### b. It is clearly established that an officer cannot arrest someone without probable cause, much less use significant force against them.

As already discussed, a reasonable jury could find that Reed lacked probable cause to seize Evans. *See supra* (III)(B)(1)(a). It is clearly established that an officer violates the Fourth Amendment when they arrest someone without probable cause.[14] *See Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019); *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001). It naturally follows that an officer cannot use significant force when effectuating an unlawful arrest.

---

[13] "We have serious doubts about the propriety of that distinction. As this case shows (and, indeed, *Melgar* itself showed), a leashed dog may be easier to control to some extent, but can nevertheless do serious damage if it tracks, locates, and ultimately bites and holds a suspect." *Maney*, 681 F. App'x at 216.

[14] "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed ... an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "Probable cause is determined by a 'totality-of-the-circumstances' approach." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). The inquiry "turns on two factors: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Id.* (quoting *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). Courts apply "an objective test to determine whether a reasonably prudent officer with that information would have thought that probable cause existed for the arrest." *Graham*, 831 F.3d at 185. "Evidence sufficient to secure a conviction is not required, but probable cause exists only if there is sufficient evidence on which a reasonable officer at the time could have believed that probable cause existed for the arrest." *Hupp*, 931 F.3d at 318.

17

Reed's bodycam footage poses a significant question whether he had probable cause to arrest Evans. The fact that a jury could find that Reed lacked probable cause to arrest Evans precludes summary judgment on qualified immunity grounds because without probable cause Reed would have violated Evans' well-established right to be free from unlawful seizure and any force associated with that seizure.[15]

### c. It is clearly established that an officer cannot use significant force when seizing a non-violent suspect accused of a misdemeanor.

Even if Reed had probable cause to arrest Evans, it was also clearly established by April 3, 2022, that an officer cannot use intermediate or deadly physical force to seize someone suspected of committing a minor crime who has no weapon, has made no threats, and who is not actively resisting. *See Dolgos*, 884 F.3d at 187 (4th Cir. 2018); *Ray*, 781 F.3d at 101; *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994).

At the time of this incident, it was clearly established that a police officer cannot use violent force to effectuate a misdemeanor arrest of a non-violent suspect. *Id.* Here, a reasonable jury could find that Reed should not have deployed Knox or struck Evans in the head multiple times to effectuate an arrest for a purported misdemeanor. After all, officers must tailor the amount of force they use to the need for that force. See *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *Graham*, 490 U.S. at 396; *Maney*, 681 F. App'x at 220 (4th Cir. 2017) ("[A] bite from a police canine is a significant use of force."); *Lewis v. Caraballo*, 98 F.4th 521, 532 (4th Cir. 2024) ("Courts have accordingly recognized the unique danger of strikes to the head.") (collecting cases where head strikes constituted excessive force); *Sawyer v. Asbury*, 537 F. App'x 283, 294 (4th Cir.

---

[15] Evans did not seek summary judgment on whether probable cause existed for his arrest. Therefore, the Court will assume the parties intend for the jury to resolve the question of whether "a reasonable officer in [Reed's] position would have believed that probable cause existed for [Evans'] arrest." *Hupp*, 931 F.3d at 321.

18

2013) (holding blow to head of a detainee in response to mere insulting words and noncompliance with orders was excessive). The Court cannot grant Reed's motion for summary judgment on qualified immunity grounds because the jury could decide that Reed's use of force ran afoul of a clearly established constitutional boundary.

### d. It is clearly established that officers cannot prolong the use of force beyond the time necessary to neutralize a suspect.

It is also clearly established that police officers violate the Fourth Amendment when: (1) they are "confronted with a clearly unarmed suspect who was going nowhere; (2) they outnumber[] [the suspect] and were beating him into submission;" and (3) "yet they chose to allow the dog to continue biting the suspect." *Maney*, 681 F. App'x at 217 (citing *Kopf*, 942 F.2d at 265). In other words, officers cannot unreasonably prolong a dog bite when a suspect is in custody. *See Escobar v. Montee*, 2016 WL 397087, at *8 (N.D. Tex. Feb. 2, 2016) (collecting cases that hold that excessive duration of the bite can constitute excessive force).

Here, a jury could find Knox continued to bite and tug on Evans' arm for several seconds after he was knocked unconscious by Reed's punches. A jury could also determine that Reed allowed Knox to continue to bite Evans well after Evans was neutralized. This jury issue also precludes summary judgment on qualified immunity grounds.

### 3. State Law Claims Against Reed

Reed also seeks summary judgment on Evans' assault and battery and gross negligence claims against him. Dkt. 52 at 16. But Reed concedes that "Evans' state law claims rise or fall with his excessive force claims." *Id.* Because the Court has already concluded that Evans' excessive force claim should be resolved by a jury, the result is no different for his assault and battery and gross negligence claims. Accordingly, Reed is not entitled to summary judgment on these state law claims.

19

## IV. CONCLUSION

Because Evans has failed to produce any admissible evidence to support his *Monell* claims against the City, the City's motion for summary judgment (Dkt. 46) must be granted.

However, because a reasonable jury could find that Reed violated Evans' clearly established Fourth Amendment right(s) and likewise violated state law, his motion for summary judgment (Dkt. 48) must be denied.

An appropriate order will follow.

Entered this __24th__ day of February, 2026.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE